MISSOURI, KANSAS & TEXAS RAILWAY COMPANY OF TEXAS v.
W. S. PAWKETT.

Decided March 11, 1902.

**1.—Railway Company—Negligence—Evidence.**

Evidence held to warrant a finding that a freight conductor was not negli-
gent in remaining in his caboose for the purpose of adjusting the switch he was
about to enter at the time he was struck by a train approaching on the main
track from behind.

**2.—Same—Master and Servant—Violation of Rules.**

The servant's violation of a rule of the master is not negligence per se, but
it is a question of fact for the jury whether, under all the circumstances, the
failure to obey the rules is excusable.

**3.—Same—Expert Evidence—Rules.**

Where the rules of defendant company were in evidence and were plain and
intelligible, it was not error to exclude the testimony of an experienced railroad
man as to what was the duty, under the rules, of a conductor situated as was
plaintiff at the time of the collision and injury, since the rules were the best
evidence.

**4.—Pleading—Limiting Recovery—Charge—Remittitur.**

Where plaintiff's petition claimed damages for time lost at the rate of $100
per month, and he testified that he earned from $100 to $125 per month accord-
ing to the amount of work he did, and the charge authorized the jury to find
"the reasonable value of plaintiff's services for the time lost," without limiting
them to the amount claimed in the petition, this was error, since the evidence
warranted a recovery for $125 per month, but the error could be cured by a re-
mittitur of $25 for each month from the time of the injury to the trial.

Appeal from Grayson. Tried below before Hon. Rice Maxey.

*T. S. Miller* and *Head & Dillard,* for appellant.

*Smith, Templeton & Talbert,* for appellee.

BOOKHOUT, ASSOCIATE JUSTICE.—Appellee was in the employ of
appellant as freight conductor on one of its trains. On the night of
June 19, 1900, he was injured by a collision of another train with his.

On September 6, 1900, he instituted this suit to recover $20,000 damages alleged to have been sustained by reason of the injuries received as aforesaid. On May 18, 1901, a trial before a jury resulted in a verdict and judgment in favor of appellee for $4000, to reverse which this appeal is prosecuted.

1. Complaint is made of the following clause of the charge: "And if you further believe from the evidence that when his (plaintiff's) train had reached Sadler, and part of the same had been placed on the side track at said point, the engine slipped and on this account plaintiff failed to clear the main track with his train, and if you further believe from the evidence that plaintiff remained at the rear of his train to adjust the switch, and that under all the circumstances and conditions surrounding plaintiff at the time, taking into consideration all the rules introduced in evidence, in so remaining at the rear of his train he acted as a person of ordinary prudence would have acted under the same circumstances, and if you further believe from the evidence that the employes on said north-bound train were running at a high rate of speed and failed to reduce said speed as said train approached the station of Sadler, and to get said train under control before reaching said station, as provided in rule 95a, introduced in evidence, and if you further believe that said north-bound train collided with said south-bound train at Sadler and that plaintiff was thereby injured in his back and hip, as alleged in his petition; and if you further believe that the employes in charge of said north-bound train were guilty of negligence, as will hereinafter be defined, in failing to reduce the speed of said north-bound train, * * * and if you further believe from the evidence that such failure to reduce the speed and get the train under control was the proximate cause of the collision and of the injuries received by plaintiff, and were not caused or contributed to by any negligence of the plaintiff, you will find for the plaintiff."

It is contended that this charge excuses plaintiff from all blame if he was justified in remaining at the rear of his train, when it was for the jury to say whether or not he was guilty of contributory negligence in not seeing that his brakeman went ahead to signal the north-bound train while plaintiff himself remained at the rear; and (2) that the undisputed evidence shows that plaintiff was guilty of a negligent violation of the rules of the company in remaining at the rear of his train without seeing or making an effort to see that his brakeman performed his duty in going ahead to signal the north-bound train.

The appellee was a conductor of a freight train operated over appellant's road. On the 19th day of June, 1900, he was injured at Sadler, a station on appellant's road between Denison and Whitesboro. The train upon which he was injured was a south-bound freight train which he was attempting to get on a side track at Sadler station in order to let a north-bound freight train pass his train. His train arrived at Sadler at 1:55 a. m. In attempting to run his train on the switch he says: "The engine slipped down, that is, it failed to pull the train and the

wheels began to slip on the rails." His train consisted of from twenty to twenty-five cars and the cars averaged from thirty to thirty-four feet in length. About eighteen of the cars had got on the sidetrack when the north-bound train came along at a rapid rate of speed and collided with the rear part of appellee's train, pushing it back about 90 or 100 yards. Appellee was standing on the rear platform of the caboose to look after the switches and see that they were lined up or set for the main track. He was thrown back by the collision several feet into the caboose on the plate which covers the king pin and received permanent injuries. Appellee testified: "In making the change from one track to another an engine will slip more than on a straight track. I heard this one slipping while I was in the caboose about the time it got on the side track, at 1:55 a. m. Cars are from thirty to forty-five feet long. They average from thirty to thirty-four feet, some of them are thirty-six feet, and there were from twenty to twenty-five cars on my train. I was then back a train's length from the switch. The engine continued to slip until we stopped, and we failed to get five cars and the caboose on the side track. About eighteen cars of our train, making 700 feet, got on the side track, and this required nearly thirteen minutes. I knew all this time that my train was slipping. I knew the other train was coming from Whitesboro. I know I could not have gone forward and protected my train in ten minutes of the time my train was slipping, for the reason that, from where my brakeman was standing at the time, to a point on the track where he could have done any good, was three-fourths of a mile. From the time my engine first began to slip I had thirteen minutes. I did not do anything myself to protect my train, except to give it slack. It did not get off the caboose to try to protect it, although I knew the engine was slipping. When our engine was slipping I knew that another train having superior rights would arrive from Whitesboro. It left Whitesboro at 2 a. m. and it is three and nine-tenths miles from Whitesboro to Sadler. I have made that distance in eight or nine minutes. I knew, even with ordinary running, that eight or nine minutes ofter 2 o'clock another train would be at Sadler on the main line, if orders were obeyed. I knew I had a right to look for the train and expect it, and was looking for and expecting it. I knew that there were some cars of my train on the main track over which the other train had the right of way. Knowing these things, I remained in the caboose and did nothing myself to protect my train. * * * A passenger train is a first class train and a freight train is a second class train. The only two classes of trains on the Missouri, Kansas & Texas Railway are passenger and freight trains. Sadler was a station. I took no steps to protect my train, because the time card protected me at the station. The switch tracks at Sadler are straight. There is a curve one-half to three-fourths of a mile south of the south switch. The track at that point curves to the left going south. I say I did not have time to get off and flag the other train, because by the time I could have gotten to where my head brakeman was to tell him to flag it, he would not have had

time to go further than the south switch, and he could not have flagged it any better from that position than from his original position. I do not know whether the headlight on my engine was covered or uncovered. My head brakeman was G. M. Ham. He was on the engine until he got off to throw the switch and let us in on the side track. His place on the train was on the engine. It was his duty to throw this switch. I was there at Sadler fifteen minutes and would not have stayed much longer before sending out somebody to flag the passenger train from the north, which is No. 4. I would have sent somebody out on account of the passenger train, because I am supposed to protect against a first class train. I am not to protect myself against a freight train which has right of way over me at a station. If I had sent anyone out on account of this train it would have been a matter of extra precaution to keep others out of trouble and not myself. I would not have taken any extra precaution, as I expected the north-bound freight to stop at Sadler unless we were in clear and had our headlight covered and our cupola lights covered. Sadler was not necessarily a place for the train to stop. I expected them to find out that we were not in clear because the light was burning so brightly and because my head brakeman was flagging. My head brakeman said he flagged them. He was flagging there just as a matter of extra precaution. It was not expected of him to necessarily flag there at all. They were supposed to come into that station under perfect control, abiding by the time card rules. The red lights in my caboose were right in the center of the main track and they could have seen them. I did not call on the head brakeman to go out and flag the train. It was not my business to see that the head brakeman did go there and flag that train, and I did not undertake to see that he did."

It is provided by rule 99 of the company that "When a train is detained by an accident or obstruction, or stops at an unusual point, the flagman must immediately go back with danger signals to stop any train moving in the same direction. At a point fifteen telegraph poles from the rear of his train he must place one torpedo on the rail on the engineman's side. He must then continue to go back at least twenty telegraph poles from the rear of his train and place two torpedoes on the rail on the engineman's side, ten yards apart (one rail length), when he may return to a point fifteen telegraph poles from the rear of his train, where he must remain until the approaching train has stopped or he is recalled by the whistle of his engine. When he comes in he will remove the torpedo nearest to the train, but the two torpedoes must be left on the rail as a caution signal to any following train." The rules further stipulate that "Conductors and enginemen will be held equally responsible for the violation of any of the rules governing the safety of their trains, and they must take every precaution for the protection of their train," and that when a train turns out to meet or be passed by another train the red lights must be removed and green displayed as soon as the track is cleared, but the red lights must be again displayed before returning to the main track. Headlights on engines, when on the

side track, must be covered up as soon as the track is clear and the train is stopped.

Rule 95a provides: "Freight and extra trains are required to approach and pass all water tanks, coal chutes, and stations completely under control. Speed must be reduced and enginemen and trainmen must commence to get their trains in hand in ample time so that under no circumstances whatever shall it be possible for it to strike any train, car, or engine which may be occupying the track. The responsibility for safety rests with the approaching freight or extra train. This rule must not be considered as relieving enginemen and trainmen from responsibility resulting from failure to comply with rules 85 and 91." It is further provided that "Conductors will be held responsible for the proper adjustment of switches used by them and their trainmen, except where switch tenders are stationed." The evidence shows that there was no switch tender at Sadler. Whether the appellee was guilty of contributory negligence in remaining on the caboose at the rear of his train under the circumstances, was a question for the jury. It was a long train. Appellee was at the rear of the train. The brakeman was at the front end of the train. The track curved about a half or three-fourths of a mile from the south end of the switch and a flagman would have had to pass this curve before a signal could have been seen a sufficient distance to have warned the north-bound train. Appellee had red lights displayed on the caboose and the caboose stood in the middle of the main track, and the evidence is that the lights could be seen by the employes on the north-bound train. The headlight of his train was uncovered, which, by the rules, indicated that his train had not cleared the main track. There being no switch tender at Sadler, it was the duty of appellee to see that the switches were properly adjusted after his train had got on the switch and cleared the main track. Under these facts the court properly left to the jury for their determination the question as to whether appellee should have gone forward and given the signals called for in rule 99. The evidence shows that the brakeman did go out on the main track a short distance and flag the north-bound freight by swinging his lantern across the track. · We are, however, of the opinion that rule 99 did not apply under the facts shown in this case. This rule would seem to apply only where trains of different classes are about to meet. A passenger train is a first class train. Freight trains are second class trains. Had the north-bound train been a passenger train, then it seems it would have been the duty of appellee to have seen that his brakeman went forward with torpedoes and lantern and gave the signals provided for in said rule. The rules require freight trains, when they approach and pass water tanks, coal chutes, and stations, to reduce the speed and bring the train under control, so that under no circumstances whatever shall it be possible for it to strike any train, car, or engine which may be occupying the track. The evidence clearly shows that the conductor and engineer on the north-bound train failed to observe this rule, in that they ran into the station at a

speed of twenty-five miles per hour. The jury found under all the facts that appellee was not guilty of contributory negligence, and that there was negligence on the part of the engineer and conductor of the north-bound train which was the proximate cause of the collision, and, as a result, of the injury to appellee. There is ample evidence to support their finding.

2. The second objection to this charge is based upon the theory that, the appellee having violated a rule of the company in not seeing that his brakeman went forward with flag and torpedoes as stipulated in rule 99, he was, as a matter of law, guilty of contributory negligence. This objection is not tenable. It is held that a servant who disobeys a rule of the company is not guilty of negligence per se. Railway v. Adams, 58 S. W. Rep., 831; Railway v. Sweeney, 36 S. W. Rep., 800; Bonner v. Bean, 80 Texas, 155. It is a question of fact whether, under the circumstances, the servant is excusable in failing to obey the rule.

3. It is contended that the court erred in refusing to permit defendant to prove by the witness C. L. Harris the precaution plaintiff should have taken under the orders and rules for the protection of his train after it failed to clear the track at Sadler in the time required. It was proposed to prove by this witness, "that under the rules and orders under which plaintiff was operating his train, plaintiff, under the circumstances stated, should have seen that his brakeman had gone ahead to signal and flag north-bound train No. 106, as specified in the rules read in evidence, and that it was not proper for him to rely upon the brakeman doing this or the engineer having it done without him, as conductor, taking any steps to see that it was done." This evidence was objected to as being an opinion, and because the rule was the best evidence. It was shown that the witness was trainmaster for certain divisions of the railway company, and had been engaged in the railroad business for twenty years. There was no error in excluding this evidence. The rules had been read in evidence; they were in writing, plain and intelligible, and were the best evidence of the matters sought to be proved by the witness.

4. It is contended under appellant's fifth and sixth assignments of error, which are grouped, that plaintiff's own evidence shows that he permitted his train to obstruct the main track for about thirteen minutes without using any precaution to protect it from other trains, and that this was contributory negligence per se. As above stated, the violation of a rule of the company by one of its servants is not negligence per se, but it is a question for the jury to determine whether, under the circumstances, he was excusable for failure to obey the rule. The evidence was sufficient to justify the jury in finding, if it be conceded that the rule applies, that plaintiff was excusable in remaining in the caboose for the purpose of adjusting the switches, and that he was not guilty of negligence.

5. Complaint is made of the following clause of the charge: "If

under the foregoing instructions you find for plaintiff, you will find such sum as you may believe from the evidence will reasonably and fairly compensate him, as a present cash payment, for the mental and physical pain he suffered, if any, on account of the injuries, if any, received by him; for the reasonable value of his services for the time lost. if any, by reason of his injuries, if any, received by him; for his diminished capacity to labor and earn money in the future, if any." The petition alleged: "That plaintiff was thrown through the open door of said caboose with great violence upon the floor of said caboose, and on an iron plate on the floor of said caboose that was raised above the level of said floor, and plaintiff's spine and back were injured, and his head was lacerated and bruised, and his side and hip were sprained, and his internal organs were bruised and impaired, and plaintiff was bruised and injured for life. That at the time plaintiff was injured, as aforesaid, he was a stout man, in good health, was 28 years old, and was earning $100 per month. That by reason of his injuries plaintiff has not been able to do any work since he was injured, and he will not be able to do any work for a year from the time he was so injured, and after said time his ability to earn money and labor has been lessened, by reason of his injuries, one-half, for lifetime. That by reason of his injuries he has incurred expenses for medicines and medical attention, $300, and has suffered and all his life will continue to suffer great physical pain and mental anguish, and has sustained damages in the sum of $20,000." Appellee testified that: "Since the accident I have not been able to do anything. I have been nervous at times when I exert myself. I suffer pain all the time; I can't rest at night; my head aches continually; my neck feels stiff and sore, and I have pains all over. Before I was injured my health was good, my back was as strong as anybody's. Since the accident I have no strength in my back; I can't bend over and lift anything to amount to anything; it hurts me; I can't describe the feeling. * * * At the time of the accident I had been earning from $100 to $125 per month. I was paid by the mile; I was paid according to the amount of work I did. I was an extra man at the time. * * * I can't see any difference between the condition of my back at the present and in June, 1900, just after the accident." The evidence as to the value of the services of the plaintiff during the time lost by him as a result of his injuries authorized a recovery for a larger sum than was claimed in the petition and the charge instructed the jury that they could find "the reasonable value of his services for the time lost." This charge was affirmative error. City of Dallas v. Jones, 53 S. W. Rep., 377. The error does not necessarily require that the judgment should be reversed. The charge of the court authorizes a recovery for the reasonable value of his (appellee's) services for the time lost. This charge clearly has reference to the past and means the time lost at the time of the trial. The trial took place just eleven months, lacking one day, after the injuries were inflicted. The evidence authorized a recovery, for services, of $125 per month; the pleading claimed $100 per

month. The jury may, in their finding, have included $25 per month for eleven months, or $275 more than was justified by the pleadings. If the appellee will enter a remittitur for that amount as of the date of the judgment within ten days, the judgment will be affirmed; otherwise it will be reversed and the cause remanded.

*Affirmed on remittitur.*

Writ of error refused.